**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
----------------------------------------------------------------X
RITCH *et al.*,

                        Plaintiffs,

        -against-

NEW YORK EYE AND EAR INFIRMARY *et al.*,

                       Defendants.
----------------------------------------------------------------X

<u>**OPINION & ORDER**</u>

**20-cv-7344 (JW)**

**JENNIFER E. WILLIS, United States Magistrate Judge:**

      The Plaintiffs, a Physician and his single member LLC, became embroiled in a dispute with the Defendants, an ophthalmology office and its President, after the Defendants ended the Parties' two contracts.  The Defendants accused the Plaintiff, Dr. Ritch, of acting unprofessionally and Dr. Ritch accused the Defendants of defamation, negligent infliction of emotional distress, failure to abide by the terms of their agreements, and a failure to properly terminate the two agreements. A review of the record proves that the two contracts were, in fact, properly terminated. The first contract could be terminated, without cause, upon sufficient advanced notice. This notice was given. The second contract could be terminated upon termination of the first contract. Because both contracts were properly discontinued, the Parties have no remaining obligations to one another.

      For the reasons that follow, Plaintiffs have failed to establish that there exists any "genuine dispute as to any material fact." <u>See</u> Fed. R. Civ. P. 56(c). Thus, Plaintiffs' Cross Motion for Summary Judgment is DENIED, and Defendants' Motion for Summary Judgment is GRANTED.

## PROCEDURAL POSTURE

This case began in July 2020, when Robert Ritch, M.D. ("Dr. Ritch") and his single member LLC, Robert Ritch, M.D. LLC ("the LLC") (collectively the "Plaintiffs") commenced a civil action against the Defendants New York Eye and Ear Infirmary ("NYEE") and Dr. James Tsai, the President of NYEE, in New York Supreme Court (the "State Court Action"). Dkt. No. 1-1.

The action alleged Breach of Contract, Age Discrimination in violation of the New York State Human Rights Law and the Age Discrimination Act (ADEA), Tortious Interference with a Business Relationship, Tortious Interference with a Contractual Relationship, Negligent Infliction of Emotional Harm, and Defamation. Dkt. No. 1-1.

In September 2020, the Defendants removed the action to federal court "pursuant to 28 U.S.C. § 1441(a) on the ground that it is an action over which this Court would have original federal question jurisdiction… the Age Discrimination in Employment Act (the "ADEA"), 42 U.S.C. § 1981, 42 U.S.C. § 1983, and 42 U.S.C. § 1985." Dkt. No. 1 at 2.

In October 2020, the Parties consented to the jurisdiction of Magistrate Judge Fox to conduct all proceedings and order the entry of a final judgment in accordance with 28 U.S.C. 636(c). Dkt. No. 14. Then, the Plaintiff filed a Second Amended Complaint in April 2021. Dkt. No. 28. On February 4, 2022, the case was reassigned to Magistrate Judge Willis.

In August 2022, the Plaintiffs withdrew the cause of action for age discrimination. Dkt. No. 56. In January 2023, with the Defendants' consent, the Plaintiffs filed a Third Amended Complaint. Dkt. No. 91.

In March 2023 the Defendants filed a Motion for Summary Judgment. Dkt. No. 118. In April, the Plaintiffs filed a Cross Motion for Summary Judgment. Dkt. No. 129.

The Parties filed replies, sur-replies, and sur-sur replies. Dkt. Nos. 132-143. Briefing concluded on June 13, 2023. Dkt. No. 143.

## BACKGROUND

The Plaintiff, Dr. Ritch, is an Ophthalmologist who is apparently "known around the world as among the very best leading experts in treating Glaucoma." Dkt. No. 91 at 1. The other Plaintiff is Robert Ritch, M.D., LLC, a single-member company owned and operated entirely by Dr. Ritch.  Dkt. No. 91 at 2.

Defendant, New York Eye and Ear Infirmary (NYEE) is a specialized Eye and Ear Hospital in New York owned by the Mount Sinai hospital system. Dkt. No. 91 at 2. Defendant James Tsai was the President of NYEE for all the periods relevant to the dispute.

In April 2015, on the same day, NYEE and the LLC entered into two different contracts: the License Agreement (the "LA", Dkt. No. 129-8) and the Director Services Agreement (the "DSA", Dkt. No. 129-7).

The License Agreement permitted the LLC access to NYEE facilities in exchange for an annual fee of $156,285.00. The LA was for a two-year term to be "automatically renewed for successive one year periods." Dkt. No. 129-8, Sec. 2.

Importantly, the LA stated that, "Notwithstanding anything herein to the contrary, each party hereto shall be entitled to terminate this Agreement without cause upon one hundred twenty (120) days prior written notice…" Dkt. No. 129-8, Sec. 2(a).

The Director Services Agreement provided that the "Hospital desires to retain the Company to…provide research and administrative services to the Hospital." And thus the Parties agreed that the "Hospital engages Company to make the Director available to provide services set forth in Exhibit A." Dkt. No. 129-7, Sec. 1.

In exchange, the DSA stated that "as consideration for the services provided…Hospital will pay Company annual compensation ("the Fee") of One Hundred Fifty-Three Thousand Five Hundred Dollars ($153,500)…plus $33.00 per hour for each hour of services provided." Dkt. No. 129-7, Sec. 6.

In Section 3 of the DSA, "Services to be Provided" the contract says, "The Hospital also agrees to offer Karen Cheifetz a part time employment opportunity, for twenty two and one-half hours per week, so that Ms. Cheifetz may provide Company with administrative assistance related solely to Company's services hereunder. The Hospital shall provide Ms. Cheifetz, or in the event Ms. Cheifetz declines the Hospital's offer of employment or ceases being a Hospital employee, a replacement

administrative assistant with suitable office space, reasonably determined by the hospital." Dkt. No. 129-7, Sec. 3(a).

In the DSA, the Parties also agreed that "the terms of Company's engagement are governed by the policies of Hospital, including specifically, the Medical Staff Bylaws and Rules and Regulations of the Medical Staff of Hospital as amended from time to time." Dkt. No. 129-7, Sec. 1.

The DSA also had a termination clause: "this Agreement may be terminated… by Hospital, with or without cause, upon one hundred eighty (180) days prior written notice to Company…this Agreement may be terminated by Hospital for cause immediately upon notice to Company. Hospital shall have cause for termination in the event of: i) Company's failure to perform any material provision of this Agreement, and such failure continues for a period of ten (10) days after written notice to Company stating the nature of the failure, unless such failure is cured to the reasonable satisfaction of Hospital within such 10-day period; ii) Company's, Research Coordinators, or Director (as the case may be) failure to satisfy or maintain any of the qualifications listed in Section 1 above; iii) Company becomes unable to fulfill its obligations under this Agreement; iv) Company's Research Coordinator's, or Director's conviction of a crime or entering into a plea of guilty or no contest with respect to a crime; and _v) termination of the License Agreement_." Dkt. No. 129-7, Sec. 7(b) (emphasis added).

On January 22, 2019, Dr. Tsai hand-delivered a letter to Dr. Ritch purporting to terminate the License Agreement. Dkt. No. 120-8.

The letter alleged, "a review of your file shows that you have a long history of inappropriate behavior towards hospital staff, and that hospital leadership made multiple efforts to counsel you about, and to discipline you for, such behavior. To mention only the most recent actions, in September 2014 Dr. Paul Sidoti placed you on probation for unprofessional behavior (among other reasons) and in November 2017 I issued a counseling letter to you for unprofessional conduct." Dkt. No. 120-8.

The letter concluded, "the License Agreement between you and NYEE dated April 20, 2015 will be terminated, effective June 30, 2019."[1] Dkt. No. 120-8.

The DSA was not immediately terminated. Dkt. No. 120-8.

The Third Amended Complaint alleges that in January 2019, "NYEE removed all of the awards and diplomas of Robert Ritch, MD. These removed items consisted of over 100 items including photographs with Presidents and Prime Ministers…" Dkt. No. 91 at 4.

Then, the first administrative assistant named in the contract, Karen Cheifetz, was replaced in September 2019 by a new administrative assistant, Brittany Roberts. Dkt. No. 129-10.

After a little under a year, on May 21, 2020, Dr. Tsai sent Dr. Ritch a letter claiming that, "the COVID-19 pandemic has had an unprecedented impact on the financial health of every hospital within the Mount Sinai Health System…as such, we have been forced to cut back…it is within that context of severe budgetary

---

[1] June 30, 2019 is 159 days after January 22, 2019.

constraints that we will be eliminating your part-time administrative assistant, Brittany Roberts." Dkt. No. 129-11.

However, on May 27, 2020, in an email, Nina Brodsky, the Senior Associate General Counsel to the Mount Sinai Health System, offered a different justification: "Ms. Roberts was a part-time employee of New York Eye and Ear and received NYEE benefits. NYEE has the right to bar her from admission to the premises and has decided to do so based on her disruptive behavior." Dkt. No. 129-16.

On May 29, 2020, Dr Ritch wrote to Dr. Tsai complaining that the replacement for Roberts, his third administrative assistant, Michelle Tapia, emailed him saying she was told she "cannot start working in the hospital office until I complete the onboarding process.  [the Coordinator] also informed me that all applications are currently on hold and they are not giving out any badges at this time… I also spoke to the nurse at my doctor's office and was told that the immunizations forms will also take about 3 weeks to complete due to the 2-step TB test." Dkt. No. 119-1 at 179.

Dr. Tsai replied that, "all applications for onboarding at NYEE are currently on hold due to the pandemic." Dkt. No. 119-1 at 177.

According to the Third Amended Complaint, Tapia was "denied entry to NYEE and Salvator Loiacana, the Vice President of Defendant Mt. Sinai…suggested that Michelle Tapia could work from Starbucks." Dkt. No. 91 at 6.

Meanwhile, on June 24, 2020, an attorney sent a draft complaint to the Mt. Sinai legal department and to Dr. Ritch's attorney Mr. Bythewood alleging that the former administrative assistant Brittany Roberts, "was subjected to a hostile work

environment and a discriminatory and retaliatory termination due to Plaintiff being African-American and a hostile work environment due to her gender. Racial derogatory remarks were uttered on an on-going continuous basis by Dr. Ritch." Dkt. No. 123-6.

On August 28, 2020, Dr. Tsai sent Dr. Ritch a letter purporting to terminate the DSA for cause: "effective immediately, the New York Eye and Ear Infirmary of Mount Sinai will terminate the above referenced agreement…for cause." Dkt. No. 120-9.

The letter provided the following reasons: "First, Section 7(b)(v) of the Agreement provides that the hospital may terminate the Agreement immediately upon termination of the License Agreement. The Hospital terminated the License Agreement effective June 30, 2019 by letter dated January 22, 2019. This alone allows for immediate termination of the Agreement." Dkt. No. 120-9.

The letter claims that "the Company is in material breach…in that you as a Director have violated Hospital policies…" Dkt. No. 120-9.

The letter goes on to allege that Dr Ritch, "refused to cooperate with an investigation into allegations made by your former assistant Brittany Roberts," and that Dr. Ritch "also made racial and derogatory comments to staff members, for instance calling an African American employee 'a monkey' and a big and tall female employee 'a walrus'. Staff who worked with you described the environment as hostile and unprofessional." Dkt. No. 120-9.

The letter further asserts that Dr Ritch "processed two applications for sponsorship for J-1 Visas…you falsely claimed on these applications that the personnel would be hired by the Hospital." Dkt. No. 120-9 at 2.

That same day, on August 28, 2020, Dr. Tsai sent a letter to Dr. Patel, the Chairman of the Medical Board for NYEE, repeating the same allegations in the letter sent to Dr. Ritch and informing Dr. Patel that he had "summarily suspended Dr. Ritch's membership on the professional staff." Dkt. No. 120-10.

In an affirmation in support of Plaintiff's cross motion (for the first time and without any additional context) Plaintiff's attorney said, "with regard to outbursts by Robert Ritch, MD., these outbursts can be explained as being due to his being a Tourette Syndrome sufferer." Dkt. No. 129-1 at 28, ¶131.

## LEGAL STANDARDS

Rule 56(a) of the Federal Rules of Civil Procedure states that a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). A "genuine issue" of a "material fact" is defined as a dispute that "may reasonably be resolved in favor of either party," and thus should be left to the finder of fact. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986).

Summary judgment may not be granted unless all of the submissions taken together "show[ ] that there is no genuine dispute as to any material fact." Snead v. City of New York, 463 F. Supp. 3d 386, 391 (S.D.N.Y. 2020)(Nathan, J.) *citing* Fed.

R. Civ. P. 56(a). In other words, summary judgment is appropriate only "when the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." Smith v. Cty. of Suffolk, 776 F.3d 114, 121 (2d Cir. 2015).

A party may rely upon "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits" to "show that there is no genuine issue as to any material fact..." Feurtado v. City of New York, 337 F. Supp. 2d 593, 596 (S.D.N.Y. 2004)(Gorenstein, M.J.) *citing* Fed. R. Civ. P. 56(c).

Only disputes over *material* facts will preclude the entry of summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). On a motion for summary judgment, "a fact is material if it might affect the outcome of the suit..." Royal Crown Day Care LLC v. Dep't of Health & Mental Hygiene, 746 F.3d 538, 544 (2d Cir. 2014).

The moving party bears the burden of demonstrating the absence of a material factual question, and in making this determination, the Court "must view all facts in the light most favorable to the non-moving party." See Eastman Kodak Co. v. Image Techn. Servs., Inc., 504 U.S. 451, 456 (1992); Gemmink v. Jay Peak Inc., 807 F.3d. 46, 48 (2d Cir. 2015). In evaluating cross-motions for summary judgment, each motion must be examined "on its own merits," and "all reasonable inferences must be drawn against the party whose motion is under consideration." Vugo, Inc. v. City of New York, 931 F.3d 42, 48 (2d Cir. 2019).

If the moving party has asserted facts showing that the non-movant's claims cannot be sustained, "the party opposing summary judgment may not merely rest on

the allegations or denials of his pleading; rather his response, by affidavits or otherwise as provided in the Rule, must set forth specific facts demonstrating that there is a genuine issue for trial." <u>Wright v. Goord</u>, 554 F.3d 255, 266 (2d Cir. 2009). "[C]onclusory statements, conjecture, and inadmissible evidence are insufficient to defeat summary judgment." <u>Ridinger v. Dow Jones & Co. Inc</u>., 651 F.3d 309, 317 (2d Cir. 2011). The same is true for "mere speculation or conjecture as to the true nature of the facts." <u>Hicks v. Baines</u>, 593 F.3d 159, 166 (2d Cir. 2010).

Finally, where "the nonmoving party bears the burden of proof at trial, summary judgment is warranted if the nonmovant fails to make a showing sufficient to establish the existence of an element essential to its case." <u>Feurtado v. City of New York</u>, 337 F. Supp. 2d 593, 596 (S.D.N.Y. 2004)(Gorenstein, M.J.) *citing* <u>Nebraska v. Wyoming</u>, 507 U.S. 584, 590 (1993).

## DISCUSSION

Plaintiffs claim 1) Defendants did not properly terminate either the LA or the DSA, 2) that the DSA was breached when Dr. Ritch (not the LLC) was paid the contractual fee, 3) that Defendants breached the DSA in preventing his administrative assistant from entering the premises, 4) that NYEE violated the LA and DSA in removing his diplomas and name from the door, 5) negligent infliction of emotional distress, and 6) defamation.  Dkt. No. 91.

Not one of these claims withstands scrutiny.

Because the Plaintiffs have not come forward with specific facts showing there is a genuine issue for trial, and because "the record taken as a whole could not lead a rational trier of fact to find" for the Plaintiffs, Plaintiffs' cross motion is denied.

Defendants, on the other hand, claim they had a right to terminate the LA upon sufficient notice, and the right to terminate the DSA upon termination of the LA. Regardless of whether Plaintiffs' factual allegations are true, Defendants still prevail. Therefore, Defendants' motion for summary judgment is granted.

### 1. SDNY Local Rule 56.1

Rule 56.1 requires the moving party to submit a statement of undisputed material facts warranting summary judgment, and the opposing party must submit a corresponding statement responding to each item set forth in the movant's statement. Local Rule 56.1.

Plaintiffs did not submit a corresponding statement responding to each item set forth in Defendants' Rule 56.1 Statement and their failure to do so could warrant the facts in Defendants' Rule 56.1 Statement be deemed admitted. See Local Rule 56.1(c) ("[e]ach numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party."). Although Plaintiffs' counsel submitted an Affirmation in Support of Plaintiffs' Opposition to Defendants' Motion which addresses allegations contained in Defendants' Rule 56.1 Statement (Bythewood Aff. ¶¶44-72), it is not based on

12

personal knowledge. Fed. R. Civ. P. 56(c)(4); see Holtz v. Rockefeller & Co., Inc., 258 F.3d 62, 74 (2d Cir. 2001) ("Where, as here, the record does not support the assertions in a Local Rule 56.1 statement, those assertions should be disregarded and the record reviewed independently."); see also Local Rule 56.1(d) ("[e]ach statement by the movant or opponent pursuant to Rule 56.1(a) and (b), including each statement controverting any statement of material fact, must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c).").

Nevertheless, rather than deem the entire 56.1 statement to be admitted, the Court concludes that it would be in the best interest of justice to review the entire record and decide the motion and the cross motion on the merits. See Elohim EPF USA, Inc. v. 162 D & Y Corp., No. 19-CV-2431 (AJN), 2021 WL 2292682, at *1 (S.D.N.Y. June 4, 2021)("The Second Circuit has expressed a strong 'preference for resolving disputes on the merits.'") *citing* New York v. Green, 420 F.3d 99, 104 (2d Cir. 2005).

## 2. LA Was Validly Terminated

Plaintiff contends that the LA was not validly terminated because, "it is clear it was the intent of the Defendants to terminate the License Agreement for cause…default is not defined in the License Agreement…consequently the License Agreement was never terminated." Dkt. No. 129-1 at 27.

The License Agreement states that, "notwithstanding anything herein to the contrary, each party hereto shall be entitled to terminate this Agreement without cause upon one hundred twenty (120) days prior written notice…" Dkt. No. 129-8,

Sec. 2(a). The language here has "a definite and precise meaning, unattended by danger of misconception" and is thus unambiguous. See Greenfield v. Philles Recs., Inc., 98 N.Y.2d 562, 569 (N.Y. 2002); see also Thor Equities, LLC v. Factory Mut. Ins. Co., 531 F. Supp. 3d 802, 807 (S.D.N.Y. 2021).

On January 22, 2019, Dr. Tsai hand-delivered a letter to Dr. Ritch that terminated the License Agreement "effective June 30, 2019." Dkt. No. 120-8. This is 159 days advance notice, well in excess of the 120 days required by the Licensing Agreement. See Dkt. No. 129-8.

In the SDNY, when a contract is terminable "without cause" courts will generally not delve into the actual reason for termination. In a commercial dispute involving Lockheed Martin, the Court explained that where "a party has an absolute, unqualified right to terminate a contract on notice pursuant to an unconditional termination clause, that party may do so without court inquiry into whether the termination was activated by an ulterior motive." See Lockheed Martin Transportation Sec. Sols. v. MTA Cap. Constr. Co., No. 09 CIV. 4077 (PGG), 2014 WL 12560686, at *31 (S.D.N.Y. Sept. 16, 2014)(internal quotations cleaned up) *citing* Big Apple Car, Inc. v. City of New York, 204 A.D.2d 109, 111 (1st Dept. 1994); see also Schwartz v. Fortune Magazine, 89 F. Supp. 2d 429, 434 (S.D.N.Y. 1999) ("[T]he court does not inquire into why a party exercised his right to terminate a contract when the contract is terminable without cause.").

So too here. The fact that the Defendants offered explanations for exercising their unilateral right to terminate the contract does not mean that the Defendants

needed to establish that such reasons amounted to a default under the agreement. Both Parties bargained for a symmetrical right to terminate the contract, without cause, upon 120 days' notice. Schron v. Troutman Sanders LLP, 20 N.Y.3d 430, 436, (N.Y. 2013)("a written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms.").

Defendants were under no obligation to give any reason for terminating the contract. The fact that they chose to do so does not transform the January 2019 letter into an attempt to terminate for cause. Thus, the truth or untruth of the allegations made in the 2019 letter is entirely irrelevant. The Court declines to weigh in on their veracity.

In his deposition, Dr. Ritch claimed he "could not recall" whether he received the letter from Dr. Tsai. Dkt. No. 119-1 at 16. However, in an attachment to his own Cross Motion for Summary Judgment, Dr. Ritch included a letter he sent to Dr. Tsai on February 3, 2019 that said, "I am writing in response to your letter of January 22, 2019 which was hand delivered to me…" Dkt. No. 129-27.

Thus, Dr. Ritch admitted he was delivered "written notice" of the License Agreement's termination. Because the letter was provided well in advance of Section 2's 120-day notice requirement, the Court rules that the License Agreement was effectively terminated on June 30, 2019.

### 3. DSA Was Validly Terminated

New York contract law requires that interrelated agreements be read together "in harmony." See Bombay Realty Corp. v. Magna Carta, Inc., 100 N.Y.2d 124, 127 (2003); see also Liberty USA Corp. v. Buyer's Choice Ins. Agency LLC., 386 F. Supp. 2d 421, 425 (S.D.N.Y. 2005)("In New York, it is the general rule that written contracts executed simultaneously and for the same purpose must be read and interpreted together.").

Courts in this circuit have recognized that an event of default under one contract could be a default under a different contract. See In re Calpine Corp., No. 05-60200 (BRL), 2007 WL 4326738, at *10 (S.D.N.Y. Nov. 21, 2007)("an Event of Default includes a "default by the Company in the payment of principal of any bond, debenture, note…"); Textron Fin. Corp. v. Plausteiner, No. 2:08-CV-254, 2009 WL 2516117, at *3 (D. Vt. Aug. 11, 2009)("the borrower's default under another agreement will constitute an event of default under the LSA"); Commerzbank AG v. Bank of New York Mellon, No. 15 CIV. 10029 (GBD), 2017 WL 1157278, at *4 (S.D.N.Y. Mar. 21, 2017)(" the Indentures incorporate the SSAs, which define Events of Default to include a material breach of the SSAs by the Servicer. Plaintiff has adequately alleged the occurrence of servicer defaults.").

The 2019 letter terminating the LA did not purport to terminate the DSA, even though it could have, because the LA stated, "Hospital shall have cause for termination in the event of…termination of the License Agreement." See Dkt. No. 129-7, Sec. 7(b).

Nevertheless, there is no provision in either the Licensing Agreement or the Director Services Agreement requiring that a notice of default be sent within any circumscribed period of time.

The Court will not "read into the contract, as an implied term, a 'reasonable time' provision…that is inconsistent with the express terms of the contract." See Grey v. Fed. Deposit Ins. Corp., No. 88-CV-7452 (THK), 1999 WL 587921, at *5 (S.D.N.Y. Aug. 5, 1999). Thus, NYEE was permitted the choice to delay exercising its right to terminate the DSA. Even though it chose to delay the exercise of that right, NYEE legally possessed the right to terminate the DSA from the moment of the termination of the LA on June 30, 2019, until it did so on August 28, 2020.

The Parties were free to bargain that termination of the Licensing Agreement would permit termination of the Director Services Agreement. The fact the two agreements were signed on the same day only highlights the interconnectedness between the two contracts.

Thus, even setting aside the myriad allegations made in the August 2020 letter, NYEE had the unilateral right to terminate the DSA as soon as the LA was terminated in June 2019. The fact that NYEE did not do so immediately did not waive that right. Thus, they were free to exercise their right to terminate in August 2020.

Section 16 of the DSA, "Notices" states, "Any notice required or desired to be given hereunder shall be in writing and delivered personally, by nationally recognized overnight delivery service or by certified mail, return receipt requested, postage prepaid." Dkt. No. 129-7. In his deposition, Dr. Ritch admitted he received

the August 28, 2020 letter and that it informed him the DSA was terminated. Dkt. No. 119-1 at 53, Tr. p. 177 and 181. The letter was sent via overnight mail in accordance with the contract. Dkt. No. 120-9. Therefore, the DSA was properly terminated on August 28, 2020.

Hence, NYEE was under no obligation to prove the truth of the allegations in the letter and the Court declines to consider them.

### 4. No Breach of Contract for Paying Dr. Ritch Directly

The Plaintiff alleges that "pursuant to the Director's Service Agreement, plaintiff Robert Ritch, M.D., LLC is required to be paid One Hundred Fifty-Three Thousand Dollars each year. NYEE and Mt Sinai were advised that no record of any such payment was found to which there was no response." Dkt. No. 91 at ¶¶ 18-19.

Based upon this alleged breach, Plaintiff claims this entitles him to $153,500 each year since 2015.

But this claim is baseless and borderline frivolous. Dr. Ritch cannot claim damages because the checks were paid directly to him rather than to the LLC. See Harsco Corp. v. Segui, 91 F.3d 337, 348 (2d Cir. 1996)(holding that under New York law a breach of contract claim requires "(1) the existence of an Agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages."); see generally Holborn Oil Trading Ltd. & Interpetrol Bermuda Ltd., 774 F. Supp. 840, 844 (S.D.N.Y. 1991)("New York law also provides for piercing the veil when a corporate entity is completely controlled by another and has no separate will of its own.").

In fact, Dr. Ritch admits that he was paid every penny. Dkt. No. 119-1 at 6, Tr. p. 22 ("Dr. Ritch, were you paid or was the LLC paid the $153,000 -- $153,500 a year? A. Yes. MR. BYTHEWOOD: Wait. With regard to this, or with regard to -- He wants to know if the LLC was paid $153,000 a year. THE WITNESS: The checks were paid. MR. BYTHEWOOD: He wants to know if the LLC was paid this money. The answer is yes or no. THE WITNESS: No. It was paid to me. Q. Was the $153,000 payment made to you instead of to the LLC? A. Yes.").

Further, NYEE's business records show that Dr. Ritch was, in fact, paid the correct amount. Dkt. Nos. 137-1, 137-2, 137-3 (showing Dr. Ritch and the LLC were paid a combined total of $1,527,441.77 from September 2017 to August 2020).

Thus, since Dr. Ritch was actually paid, this does not amount to a breach of the contract, and certainly not a breach that resulted in any damages.

### 5. No Breach of Contract for Delay in Onboarding Administrative Assistant

In Section 3 of the DSA, "Services to be Provided" the contract says, "The Hospital also agrees to offer Karen Cheifetz a part-time employment opportunity, for twenty-two and one-half hours per week, so that Ms. Cheifetz may provide Company with administrative assistance related solely to Company's services hereunder. The Hospital shall provide Ms. Cheifetz, or in the event Ms. Cheifetz declines the Hospital's offer of employment or ceases being a Hospital employee, a replacement administrative assistant with suitable office space, reasonably determined by the hospital." Dkt. No. 129-7, Sec. 3(a).

19

In the DSA, the Parties also agreed that "the terms of Company's engagement are governed by the policies of Hospital, including specifically, the Medical Staff Bylaws and Rules and Regulations of the Medical Staff of Hospital as amended from time to time." Dkt. No. 129-7, Sec. 1.

Plaintiff alleges that this provision of the contract was violated when NYEE denied his third administrative assistant, Michelle Tapia, access to the building in June 2020. He also claims that NYEE's dismissal of his second administrative assistant, Brittany Roberts, without his input or permission, due to alleged COVID-19 "budgetary constraints" violated the DSA.

Numerous courts have held that COVID-19-related difficulties, especially financial burdens caused by COVID-19, do not excuse the failure to perform under a contract. See LMREC III Note Holder, Inc. v. Hudson EFT LLC, No. 20-CV-5063 (KMK), 2022 WL 3997017, at *8–9 (S.D.N.Y. Sept. 1, 2022)("A number of courts have rejected the impossibility defense as an excuse for [parties] not performing contractual obligations ... during the COVID-19 pandemic.") *citing* A/R Retail LLC v. Hugo Boss Retail, Inc., 149 N.Y.S. 3d 808, 826 (N.Y. Sup. Ct. May 19, 2021); see also Gap Inc. v. Ponte Gadea New York LLC, 524 F. Supp. 3d 224, 237–38 (S.D.N.Y. 2021) ("The fact that its continued performance may be burdensome, even to the extent of insolvency or bankruptcy ... does not render [the plaintiff's] performance objectively impossible under New York law."); CW A&P Mamaroneck LLC v. PFM WC-1, LLC, 162 N.Y.S.3d 924 (N.Y. Sup. Ct. Mar. 16, 2022) ("In recent cases, the majority of decisions have rejected attempts to assert the doctrines of frustration of purpose or

impossibility of performance based on government restrictions arising from the COVID-19 pandemic.").

Thus, even if the financial strength of the Mount Sinai Health System was weakened by COVID-19 (a dubious assertion given the deluge of government funds allocated during the pandemic), NYEE had no right to renege on its commitment to provide an administrative assistant to Dr. Ritch and his LLC.

However, the Plaintiffs have failed to introduce specific facts that create a genuine dispute of any issue that would establish a contract violation here. Even assuming all the facts as alleged by Dr. Ritch are true, the hospital bargained for the right to "reasonably determine[]" the "suitable office space" as well as to require Dr. Ritch's third administrative assistant to comply with "the policies of Hospital". Dkt. No. 129-7, Sec. 1.

Thus, it was not a breach of the contract to suggest that the administrative assistant temporarily work remotely from Starbucks. The fact that there would be a delay in providing the administrative assistant with a badge to enter the hospital was not a breach of the contract.

The DSA explicitly details that any administrative assistant would be a "Hospital employee" rather than an employee of Dr. Ritch's LLC. Section 3 detailing that the administrative assistant would be a "hospital employee" must be read in harmony with Section 1's incorporation of the "policies of the Hospital". Whitestone Constr. Corp. v. Yuanda USA Corp., No. 1:20-CV-1006-GHW, 2021 WL 5234395, at *5 (S.D.N.Y. Nov. 9, 2021)("[T]he intent of the parties must be found within the four

corners of the contract, giving a practical interpretation to the language employed and reading the contract as a whole."); Beal Sav. Bank v. Sommer, 8 N.Y.3d 318, 324, (N.Y. 2007)("a contract should be read as a whole, and every part will be interpreted with reference to the whole.").

Hence it is inevitable that there would be a short period of onboarding, and that during a pandemic, this onboarding process would be delayed. Indeed, in an exhibit submitted by the Plaintiff, the administrative assistant herself explained that "I also spoke to the nurse at my doctor's office and was told that the immunization forms will also take about 3 weeks to complete due to the 2-step TB test." Dkt. No. 119-1 at 179.

Given that the contract with Dr. Ritch's LLC was terminated on August 28, 2020, the short delay in onboarding the new administrative assistant is not a breach of the DSA. Perhaps if the DSA were not terminated, and the onboarding process stretched on, it would eventually amount to a refusal to provide Dr. Ritch with an assistant and a violation of Section 3 of the DSA. But once the DSA was validly terminated, NYEE no longer had any obligation to onboard a new administrative assistant.

Dr. Ritch has provided no evidence to the contrary aside from his own conclusory allegations that other, younger doctors were permitted to onboard their employees. See Deebs v. Alstom Transp., Inc., 346 F. App'x 654, 656 (2d Cir. 2009) (affirming district court's decision granting defendant's summary judgment where

the only evidence cited to by plaintiffs was their own self-serving testimony). At this point in the litigation, after three years of discovery has concluded, this is not enough.

### 6. No Breach of Contract for Removing Personal Items

The Third Amended Complaint alleges that in January 2019, "NYEE removed all of the awards and diplomas of Robert Ritch, MD. These removed items consisted of over 100 items including photographs with Presidents and Prime Ministers…" Dkt. No. 91 at 4.

There is nothing in either the License Agreement or the Director Services Agreement that expressly or impliedly obligates the Defendants to permit Dr. Ritch to promote his diplomas and other achievements at NYEE.

In fact, the License Agreement explicitly states, "the Licensor shall be solely responsible for maintenance and repair of the Medical Space." Dkt. No. 129-8, Sec. 1(d).

As NYEE was "solely responsible" for maintenance of the Medical Space, if the contract provides one of the Parties the right to decide what goes on the walls, it would be the Defendants.

Thus, Plaintiffs have not "set forth specific facts demonstrating that there is a genuine issue for trial." Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009). Even if the Court adopted Plaintiffs' version of events, Plaintiff cannot prevail. Therefore, Defendants are entitled to summary judgment.

**7. NIED Claim Fails Because Plaintiff Does Not Allege a Fear of Physical Danger**

Dr. Ritch also asserts a claim for negligent infliction of emotional distress. Dkt. No. 91 at 13, ¶90-103. Plaintiff alleges that "by the actions and omissions of the defendants, Robert Ritch, MD has suffered severe stress and medical condition aggravation." Dkt. No. 91 at 13.

To prevail on a claim for negligent infliction of emotional distress, Plaintiff must allege that he "was owed a duty, that the defendant breached the duty, and that the plaintiff suffered emotional injury as a result. In addition, the defendant's conduct must have unreasonably endangered the plaintiff's physical safety." See Fisk v. Letterman, 424 F. Supp. 2d 670, 676 (S.D.N.Y. 2006).

Many courts have held that it is critical to plead a "fear of physical safety" to prevail on an NIED claim. See Francis v. Kings Park Manor, Inc., 992 F.3d 67, 81 (2d Cir. 2021) at fn 57 ("To establish the fourth element, the plaintiff generally must plead that the breach endangered his physical safety or caused him to fear for his physical safety."); Goldrich v. Masco Corp., No. 22-CV-3769 (KMK), 2023 WL 2649049, at *9–10 (S.D.N.Y. Mar. 27, 2023); Brevil v. County of Rockland, No. 15-CV-5103 (VB), 2017 WL 4863205, at *9 (S.D.N.Y. Oct. 26, 2017) *citing* Acquista v. New York Life Ins. Co., 285 A.D.2d 73, 83 (1st Dep't 2001) and Green v. Leibowitz, 118 A.D.2d 756, 757 (2d Dep't 1986).

Nowhere does Dr. Ritch make any allegation that NYEE endangered his physical safety. In fact, Dr. Ritch admitted that he did not have any fear for his

physical safety. Dkt. No. 119-1 at 58, Tr. p. 196 ("No. What are they gonna do, knife me? Yeah it never occurred – I mean, I didn't think it was a physical problem.").

Therefore, Plaintiffs have failed to "make a showing sufficient to establish the existence of an element essential to its case." Feurtado v. City of New York, 337 F. Supp. 2d 593, 596 (S.D.N.Y. 2004)(Gorenstein, M.J.) *citing* Nebraska v. Wyoming, 507 U.S. 584, 590 (1993).

### 8. Defamation Claim Fails Because Dr. Tsai and Dr. Patel Are Shielded by the Qualified Privilege for Common Interest Communications

Plaintiff also alleges defamation by libel against Dr. Tsai. See Dkt. No. 91 at 19 ¶ 152-157.

On August 28, 2020, Dr. Tsai sent a letter to Dr. Patel, the Chairman of the Medical Board for NYEE, repeating the same allegations in the letter sent to Dr. Ritch and informing Dr. Patel that he had "summarily suspended Dr. Ritch's membership on the professional staff." Dkt. No. 120-10. It is this letter that Plaintiff claims included falsities that damaged his reputation. See Dkt. No. 91 at 19 ¶ 152-157.

New York affords a qualified protection to even defamatory statements if they are made in good faith and said from one person to another in which both have a "common interest". See Stillman v. Ford, 22 N.Y.2d 48, 53, 238 N.E.2d 304 (1968) ("A communication made by one person to another upon a subject in which both have an interest is protected by a qualified privilege."); Ramsaran v. Abraham, No. 15-CV-10182 (JPO), 2017 WL 1194482, at *5 (S.D.N.Y. Mar. 30, 2017)("New York affords qualified protection to defamatory 'communication[s] made by one person to another

upon a subject in which both have an interest,' the so-called common interest privilege…is simply stated, 'a bona fide communication made upon any subject matter in which the party communicating has an interest or duty is protected by a qualified privilege when it is made to a person having a corresponding interest or duty.'")(citations omitted).

New York appellate courts have previously held that statements between an organization's board members or between an employee's supervisors are entitled to the common interest privilege. See Liberman v. Gelstein, 80 N.Y.2d 429, 430 (N.Y. 1992)("statement to a colleague on the board of governors [of a tenant association]…although slanderous per se, falls within the "common interest" privilege as a communication made by one person to another upon a subject in which both have an interest."); Bayer v. City of New York, 60 A.D.3d 713, 714 (2nd Dept. App. Div. 2009)("the alleged defamatory statement was protected by a qualified privilege since [Defendant] made it to other persons who had an interest in his assessment of the plaintiff's work behavior.")

So too here. Dr. Tsai and Dr. Patel clearly share a common interest. Dr. Patel is the Chairman of the Medical Board of NYEE. Dkt. No. 120 at ¶ 14. Dr. Tsai is the President of NYEE. Dkt. No. 120 at ¶ 1. They absolutely share an interest in whether one of NYEE's physicians has acted unprofessionally. Indeed, evaluating the doctors' behavior is their job. Thus, regardless of whether any of the accusations are true, in the absence of any evidence of actual malice, the statements are shielded by the common interest qualified privilege.

Therefore, the defamation claim cannot stand.

## 9. The Tortious Interference Claim Fails Because NYEE Cannot Interfere With Its Own Contract

Plaintiff alleges that NYEE engaged in tortious interference when it terminated his second assistant Brittany Roberts and when it temporarily denied his third assistant Michelle Tapia access to the hospital. Dkt. No. 91 at ¶ 104-115.

But one cannot tortiously interfere with her own contract. See Maragh v. Roosevelt Island Operating Corp., No. 16-CV-7530 (JMF), 2018 WL 6573452, at *5 (S.D.N.Y. Dec. 13, 2018) ("By definition, no tortious interference claim could lie against [Defendant], which is manifestly not a third party to the relationship…"); Ashby v. ALM Media, LLC, 110 A.D.3d 459 (1st Dept. App. Div. 2013)("It is well established that only a stranger to a contract, such as a third party, can be liable for tortious interference with a contract.").

Therefore, given that the contractual relationship that Plaintiff claims was tortiously interfered with is the same DSA to which the LLC and NYEE were counterparties, NYEE cannot tortiously interfere with the DSA. NYEE cannot tortiously interfere with its own contract. In the absence of any allegation that Dr. Tsai acted outside the scope of his authority as President of NYEE, the tortious interference claim also fails.

## CONCLUSION

The Parties bargained for a right to terminate the License Agreement, without cause, upon 120 days' notice. This notice was given, and the License Agreement was effectively terminated. Because the other contract, the Director Services Agreement,

explicitly included termination of the License Agreement as an event of default, that agreement was also effectively terminated. With both agreements discontinued, the Parties have no further obligations to each other. Because of this, as well as because the other claims are legally defective, Plaintiffs have failed to establish that there exists any "genuine issue as to any material fact". See Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Thus, the Defendants are entitled to a judgment as a matter of law. Id.

Thus, Plaintiffs' Cross Motion for Summary Judgment is DENIED, and Defendants' Motion for Summary Judgment is GRANTED.

**The Clerk of the Court is respectfully requested to close the case.**

SO ORDERED.

DATED:     New York, New York
           September 29, 2023

_____
JENNIFER E. WILLIS
United States Magistrate Judge